SUN MUT. INS. CO. (MEIGS v.). See Case No. 9,396.

SUN MUT. INS. CO. (OCEAN INS. CO. v.). See Cases Nos. 10.407 and 10,408.

SUN MUT. INS. CO. (WRIGHT v.). See Case No. 18,095.

## Case No. 13,619.

### The SUNNYSIDE.

[5 Ben. 162.] [3]

District Court, E. D. New York. May, 1871.

COSTS—WITNESS' FEES.

A witness, subpœnaed at the place of trial on the day on which he is required by the subpœna to attend in court, is not entitled to travel fees to and from his place of residence. If not so subpœnaed, he is entitled to such travel fee.

In admiralty.

## Case No. 13,620.

### The SUNNYSIDE.

[1 Brown, Adm. 227; 6 Am. Law T. Rep. 277; 14 Int. Rev. Rec. 103; 3 Chi. Leg. News, 330.] [1]

Circuit Court, E. D. Michigan. April, 1873. [2]

COLLISION — RESPONSIBILITY OF VESSEL AT REST EXHIBITING COLORED LIGHTS — LOOKOUT—DUTY OF MASTER AS TO LIGHTS — ANNOUNCEMENT BY LOOKOUT—DUTY TO REANNOUNCE LIGHTS.

1. A tug lying in the open lake, waiting for a tow, and exhibiting colored lights, is held to the responsibility of a steamer under way.

2. Where a steamer in the open sea, at rest directly in the path of a sailing vessel, exhibited colored lights, as if she were under way, and the latter was guilty of no negligence in not discovering the false indication of the lights in time to avoid a collision, she was held faultless in keeping her course, although the steamer was sunk by the collision.

[Cited in The Free State, Case No. 5,090.]

3. When a light has once been announced to the officer in charge of a vessel obliged, under the rules, to keep her course, and he has carefully observed its character, bearing, and course, and all apparent conditions indicate ab-

[3] [Reported by Robert D. Benedict. Esq., and here reprinted by permission.]

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission. 14 Int. Rev. Rec. 103, and 3 Chi. Leg. News, 330, contain only partial reports.]

[2] [Reversed in 91 U. S. 208.]

solute safety if the law is complied with, he may leave the future watching of such a light to an experienced lookout, in confidence that the vessel bearing it will be guilty of no gross negligence. Especially may he return to his other necessary duties midships.

[Cited in Meyers Excursion & Nav. Co. v. The Emma Kate Ross, 41 Fed. 28.]

4. If any circumstances suggest danger, or a departure from the ordinary rules by the other vessel, then the duty of greater watchfulness is imposed upon the master, and he would not be authorized to leave to an unassisted lookout the duty of determining when a reannouncement of the light was necessary.

5. If, in these circumstances, the duty of watching a light has been fairly performed, the court should not severely criticise the best exercise of an officer's judgment, although believed to be erroneous. Especially should it not be deemed a fault when the conduct of the other ship has been gross and unwarrantable.

6. Where the libellant has been guilty of gross fault, and that of the respondent is in any degree doubtful, a decree for division of damages should not be rendered.

[Cited in The Athabasca, 45 Fed. 655.]

7. It is not the duty of a lookout to reannounce a light, unless some new conditions occur which an intelligent officer of the deck would not anticipate, and in reference to which some new order would be given. In this case, the continuous bearing of the tug, which indicated her to be at rest instead of under way, did not present such conditions, as the fact was common, and did not suggest the slightest danger or difficulty.

8. Where the original libel set up a grossly false case, and an attempt has been made to support it by inherently incredible proof, although an amendment has been allowed in the court below, alleging a right of recovery upon wholly different grounds, these facts may rightly be looked to on appeal, in denying relief by a division of damages, in favor of a libellant who thus concealed his own wrong, and sought a recovery in full from the respondent.

Libel and cross libel for collision. The collision occurred on Lake Huron, some five or six miles from, and a little above the port of Lexington, in the state of Michigan, at about three o'clock in the morning of the 14th day of June, 1869. The night was clear, and although it was not yet daylight, the morning had dawned, and a vessel could be seen from one and a half to two miles distant. The wind was southwest. The tug was then, and for several hours previously had been waiting for a tow. She had her bright and colored lights burning; and although her steam was up, her machinery was not in motion, and she was lying entirely still, except that she was drifting before the wind in a northeasterly direction, at the rate of from one to two miles per hour. At the time of the collision she was heading eastwardly, or as some of the witnesses say, east by north half north. The bark was on a voyage from Erie to Chicago with a cargo of coal, and at the time of the collision was, and for some time previously had been sailing on a course north half west. She had all sails set, and was moving through the water at the rate of about nine miles per hour. The bark struck the tug while the latter was lying as above

described, hitting her just forward of the pilot-house, at about right angles, or perhaps angling a very little forward, crushing in her timbers, and causing her to sink in about 15 minutes. The fault charged in the libel against the bark was a sudden change of course when in dangerous proximity to the tug, thereby causing the collision.

The defense set up by the answer for the bark, and the faults charged against the tug by the answer and cross libel, were: (1) The change of course alleged against the bark is denied. (2) It is denied that the tug's officers and men were properly stationed and attentive to their duties, and the contrary is charged. (3) It is charged that the tug lay where she did, directly in the path of vessels, without proper lights, with no lookout or officer on deck, a mere obstruction to navigation. (4) "That, about 3 o'clock, the bark, heading as above, with all sail set, was proceeding on her course a few miles off Lexington, in the usual frequented track of vessels; a bright and green light was discovered a little over the port bow, indicating a steamboat standing to the eastward; that said bark was kept steadily on her course until a collision was inevitable, when the helm of the bark was ordered hard up, to ease the blow, if possible, but before said order could take effect the bark and tug collided."

The evidence showed that the lights of the tug were seen from the bark, as above stated, when one and a half to two miles distant. Upon the trial it was claimed by the respondent that the allegation of the libel, with regard to a change of course on the part of the bark, was not sustained by a preponderance of testimony; but it was insisted by libellant that, even if this were so, she had been guilty of other faults contributing to the collision; and permission was given to amend the libel by inserting the following averment: "That said tug was then lying motionless upon the water, and out of the track of vessels going up and down the lake; that, as your libellant is informed and believes, no proper lookout was kept upon the said bark; and that the said collision was occasioned by the failure of the officers and crew of said bark to see said tug, to discover that she was not in motion, and to take steps to avoid her."

The following opinion was delivered by the district court:

"The only fault attributed to the bark by the original libel, viz., a change of course, is not sustained by the proofs, but on the contrary it clearly appears that the bark kept her course without any variation up to the moment of collision. If the trial had been confined to this one allegation of fault, the libel should clearly be dismissed. But such is not the case. A large portion of the testimony, admitted without objection, relates to other questions of fault on the part of the bark, and of excuse on the part of the tug, than those set up in the libel, and the case was really tried and submitted upon those

other questions. I had no doubt the case had been as fully and fairly tried, and could be as satisfactorily disposed of as it could be if the original libel were dismissed and a new one filed, covering the case more fully as made by the testimony. The court, therefore, in the exercise of that broad discretion possessed by it, allowed the libel to be amended, and will dispose of the case upon the merits as really presented and submitted at the hearing. [The Syracuse] 12 Wall. [79 U. S.] 167. It is clear to my mind that gross faults are attributable to both vessels.

"First. As to the tug. The tug, showing as she did, the lights of a steam vessel in motion, must be held to the responsibilities and duties of such vessel. By article 15 of the collision act of 1864 [13 Stat. 60], it was the duty of the tug to keep out of the way of the bark, provided the bark kept her course, as was her duty under article 18. The bark, as we have seen, did keep her course. Therefore, the tug is clearly in fault in not keeping out of the way of the bark, unless the excuses set up for her, or some of them, are tenable. The excuses set up. It is contended on behalf of the tug, that she had a right to lie where she was lying, in wait for a tow, and that it was customary for tugs to do so. The tug undoubtedly had the right claimed; but while exercising that right she had no right to exhibit the lights of a steam vessel in motion, and thereby mislead other vessels as to her status and intentions. If she would exercise that right in the night time in such a manner as to exempt herself from the duty imposed by article 15, she must do so at anchor, and with her anchor light up. It is also contended on behalf of the tug that some portions of her engine or machinery were partially disabled, in consequence of which she could not get under motion readily when lying still. This excuse is clearly untenable, because, first, it appears that no effort whatever was made to put her in motion; and, second, it does not appear but that there had been ample opportunity for repairs since the disability was known to exist. The tug, then, was clearly in fault in not keeping out of the way of the bark.

"Second. As to the bark. The duty of a steam vessel to keep out of the way of a sailing vessel, and of the latter to keep her course, does not excuse the sailing vessel from the observance of ordinary care in her navigation, nor from the use of such means as may lie in her power to avoid a collision in case of immediate danger, even though that danger may have been made imminent by a non-observance of duty on the part of the steam vessel. Such I understand to be the effect of article 19, which is as follows: 'In obeying and construing these rules, due regard must be had to all dangers of navigation, and due regard must also be had to any special circumstances which may exist in any particular case rendering a departure from the above rules necessary in order to avoid immediate danger.' That is to say, these rules are made expressly for preventing collisions. Now, if under 'any special circumstances which may exist in any particular case,' it is necessary to depart from these rules in order to accomplish the very object the rules are intended to accomplish, then it is just as much the duty of a vessel to depart from the rules, as it is under other circumstances to adhere to them. It will not do to say that because one vessel shall fail to do its duty, the other is thereby licensed to run her down and destroy her when such a result may be avoided by the exercise of ordinary care and precaution. And yet in order to exonerate the Sunnyside from blame in this case we must adopt that theory. The bright and green lights of the tug were seen and reported by the lookout on the Sunnyside when one and a half to two miles distant. The lights were seen a little over the port bow of the bark, and clearly indicated a steam vessel headed to the eastward and across the bows of the bark. When the tug's lights were reported by the lookout, the mate then in charge of the navigation of the bark came forward and looked at the tug's lights, and said to the lookout he 'supposed it was a steamer, and guessed she would take care of herself.' The mate then went aft to watch some lights there were to leeward, and paid no further attention to the tug's lights; and from this time the tug's lights were not reported, nor was any watch kept, or any notice whatever taken of them on board the bark until the lookout saw the tug right under the bows of the bark, and a collision was inevitable. Ordinary care and precaution require that when a light is once seen in circumstances to involve risk of collision, close watch must be kept of such light until it is safely passed. See article 20, Collision Act April 20, 1864; 1 Pars. Shipp. & Adm. 595, note 3; The Gray Eagle, 9 Wall. [76 U. S.] 505; The Havre [Case No. 6,232]; The Maria Martin, 12 Wall. [79 U. S.] 31, 47.

"The lights of the tug, as we have seen, were made from the bark when from one and a half to two miles distant. The bark was moving through the water at the rate of nine miles per hour, at which rate she must have been from ten to fourteen minutes reaching the tug after her lights were first seen from the bark. There could have been no difficulty, by the exercise of the commonest care and precaution on board the bark, in determining that the tug was not in motion, but was slowly drifting right up into the course of the bark, where a collision must be inevitable unless the bark herself did something to avoid it. Neither was there any difficulty in the way of the bark avoiding a collision, and if ordinary care and precaution had been exercised, she would no doubt have done so. Because that care and precaution were not exercised, the presumption is that the bark was in fault,

and that such fault contributed to the collision; and, such presumption not being rebutted, she must stand her fair proportion of the loss occasioned by it. [Williamson v. Barrett] 13 How. [54 U. S.] 108; [The Ariadne] 13 Wall. [80 U. S.] 475, 478.

"The tug and the bark were therefore both in fault, and the damages sustained by both on account of the collision must be equally divided between them. Decree dividing damages." [3]

From this decree an appeal was taken by the owner of the bark.

H. B. Brown and W. A. Moore, for the libellant and appellee.

The evidence clearly shows that the lookout upon the bark, after making the tug's light at a distance of 1½ miles and nearly dead ahead, turned to look for other lights, and paid no further attention to the tug until he saw her directly under his jib-boom. It is hardly necessary to cite authorities to the proposition that the want of a proper lookout is a fault of the grossest description, and in case of doubt, every presumption is in favor of the proposition that it contributed to the collision. From the multitude of cases, the following are cited: 1 Pars. Shipp. & Adm. 577; The Wings of the Morning [Case No. 17,872]; The Emily [Id. 4,453]; The Blossom [Id. 1,564]; Goslee v. Shute, 18 How. [59 U. S.] 463; Whitridge v. Dill, 23 How. [64 U. S.] 448. There must not only be a proper lookout, but he must actually perform his duty. The John Fraser, 21 How. [62 U. S.] 184, 195; The Vianna [Swab. 405]; 1 Pars. Shipp. & Adm. 577, note; The Genesee Chief, 12 How. [53 U. S.] 443. Though a sailing vessel, meeting a steamer, is bound, in general, to keep her course, she has not necessarily discharged her whole duty by so doing. She is bound to watch a steamer's lights as much as those of a sailing vessel, and to prevent a collision if she can. The tug may be disabled or unable to move, and still not in fault for exhibiting colored lights (The Esk, L. R. 2 Adm. & Ecc. 350; The George Arkle, Lush. 382), a white light being proper only when a vessel is actually holden by her anchor. She may be in actual violation of a rule of navigation in not keeping out of the way, but, certainly, that does not authorize a sailing vessel to run her down. Other "special circumstances" may exist, requiring a departure from the general rule, and under article 19 of the sailing rules, the vessel is bound to provide against such emergencies. By article 20, nothing can exonerate for "the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 1 Pars. Shipp. & Adm. 580,

595; The Hope, 1 W. Rob. Adm. 157; The Cornelius C. Vanderbilt [Case No. 3,235]; The New Champion [Id. 10,146]; The New Jersey [Id. 10,161].

It is evident if the lookout had watched the tug's light carefully, he would quickly have discovered she was at rest; as her motion, if she had been moving, would have been directly across his course; and this he admits—it would then have been his duty to call the mate's attention to the fact, and that of the mate to hail her or otherwise attract her notice, and failing to do this, to starboard his helm a point and pass under her stern after he had approached so near that it had become apparent that an immediate change must be made to avoid a collision. He would have no right then to assume that the tug would back to get out of his way. The position taken by claimant is based upon the theory that a sailing vessel encountering a steamer, has but a single duty to perform, and that she may dash blindly on her course, treating the steamer, what she is averred in the cross-libel in this case to be, a simple "obstruction to navigation." There are three cases which cover this completely: The A. Denike, reported in 1 Pars. Shipp. & Adm. 595, note 3 (U. S. Cir. Ct. Mass.), where the similarity is positively striking: even the same expression was used by the pilot; The Gray Eagle, 9 Wall. [76 U. S.] 505, where the proposition is distinctly laid down that it is the duty of a lookout to watch a light until all danger is past; that because a white light usually indicates a vessel at anchor, it need not always do so, and that the fault of one vessel does not authorize another to run recklessly over her; The Havre [supra], where the same proposition was substantially repeated. See, especially, remarks of court on page 303. See, also, The Wings of the Morning [supra]; The Ariadne, 13 Wall. [80 U. S.] 475. In the case of The Hope, 1 W. Rob. Adm. 157, it was held, by the high court of admiralty, that no vessel shall unnecessarily incur the probability of a collision by a pertinacious adherence to the strict rules of navigation. In the following cases it was held that the fact that one vessel is in fault will not justify another in the infliction of an injury which could have been avoided by the observance of proper skill and care: Mills v. The Nathaniel Holmes [Case No. 9,613]; Western Ins. Co. v. The Goody Friends [Id. 17,436]. The rule is equally well settled in the common-law courts, that a party is not to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it if he does not himself use common and ordinary caution. The fact that a person is riding on the wrong side of the road will not authorize another to ride against him. Butterfield v. Forrester, 11 East, 60; Bridge v. Grand Junction R. Co., 3 Mees. & W. 245; Gough v. Bryan, 2 Mees. & W. 770; Munroe v. Leach, 7 Metc. [Mass.]

---

[3] [A reference was had to a master, and exceptions filed to his report were overrruled, and a final decree entered for the libellant for $4,724.09, together with costs of the suit. Case No. 13,621.]

274; Farwell v. Boston & W. R. Co., 4 Metc. [Mass.] 49; Ang. & D. Highw. § 345; Shear. & R. Neg. § 33, note 2. We cheerfully accede to the doctrine that where a fault is proven it will be presumed to be the cause of the collision, but insist it has no application where a contributory fault is clearly shown. 1 Pars. Shipp. & Adm. 580, 595; Williamson v. Barrett, 13 How. [54 U. S.] 101.

F. H. Canfield and G. V. N. Lothrop, for the claimant and cross-libellant.

No case can be found where a sailing vessel has kept her course and been condemned for a collision with a steamer, where the latter exhibited the lights of a vessel in motion. The allegation of a change of course on the part of the bark, was not insisted upon at the argument. The tug was at rest while displaying the signal lights of a vessel in motion, and the presumption is that this contributed to the collision. Waring v. Clark, 5 How. [46 U. S.] 465; The Esk, L. R. 2 Adm. & Ecc. 350; The Continental [Case No. 3,141], Taylor v. Harwood [Id. 13,794]; The Scotia [Id. 12,513]. By lying practically at anchor in the pathway of vessels, exhibiting the lights of a steamer under way, yet making no effort to avoid the bark which she had deceived as to her true character and condition, she was guilty of a positive and willful violation of law. All doubts should be resolved against her. The rules prescribed by the collision act should be rigorously enforced. St John v. Paine, 10 How. [51 U. S.] 557; Crocket v. Newton, 18 How. [59 U. S.] 583; Steamship Co. v. Rumball, 21 How. [62 U. S.] 385; The Carroll, 8 Wall. [75 U. S.] 305; The Johnson, 9 Wall. [76 U. S.] 146; The Fannie, 11 Wall. [78 U. S.] 238. It was the duty of the bark to keep her course. The tug had the right to lie still till there was danger of collision, and it is conceded that up to this time the bark was not in fault for keeping her course. But it is only at this point that the rules themselves apply. They require the bark, after there is probability of collision, to keep her course. Had she failed to do so she would have been a wrong-doer. The Potomac, 8 Wall. [75 U. S.] 592; Bentley v. Coyne, 4 Wall. [71 U. S.] 512; Baker v. City of New York [Case No. 765]; Wakefield v. The Governor [Id. 17,049]; Haney v. The Louisiana [Id. 6,021]; The Corsica [Id. 3,256]; S. C., 9 Wall. [76 U. S.] 630; The William Young [Case No. 17,760]; The Oregon v. Rocca, 18 How. [59 U. S.] 572; Crocket v. Newton, Id. 581; The Northern Indiana [Case No. 10,-320]; The Clement [Id. 2,879]; The R. B. Forbes [Id. 11,598]; The Western Metropolis [Id. 17,441]; The Test, 5 Notes of Cas. 276; The George, 2 W. Rob. Adm. 386; The Vivid, 7 Notes of Cas. 127; The Superior, 6 Notes of Cas. 607. There was no want of a proper lookout upon the bark. He was an experienced sailor, properly stationed. He reported the light to the officer, who came

forward and looked at it. A proper construction of his testimony shows that it is not true, as argued, that he paid no further attention to the light till the collision was inevitable. He says the bark kept straight on her course, and he saw no change in the tug's lights; and at the time of the collision he saw the same lights he had seen from the first. But even if the lookout was insufficient, it did not contribute to the collision, as it would still have been the duty of the bark to keep her course. The Fannie, 11 Wall. [78 U. S.] 238, The Europa, 2 Eng. Law & Eq. 557; The City of Paris [Case No. 2,765]; The Hansa [Id. 6,038].

The libellant fails to show that the officers of the bark could have ascertained by the exercise of ordinary care that the tug would not get out of the way, and that a change of course was necessary. They had a right to presume the tug would obey the law, and not violate it. Williamson v. Barrett, 13 How. [54 U. S.] 101; The Clement [supra]. If there are any doubts they must be resolved against the tug. Wheeler v. The Eastern State [Case No. 17,494]; Strout v. Foster, 1 How. [42 U. S.] 89; Halderman v. Beckwith [Case No. 5,907]; The Delaware v. The Osprey [Id 3,763]; The Ariadne [Id. 525]; The Test, 5 Notes of Cas. 276; The Grace Girdler, 7 Wall. [74 U. S.] 203. Admitting the bark might have been managed more wisely, her master was guilty only of an error in judgment, not of a fault. The Delaware v. The Osprey [supra]; The Genesee Chief, 12 How. [53 U. S.] 268; The Scotia [supra]; The Grace Girdler, 7 Wall. [74 U. S.] 203; The City of Paris, 9 Wall. [76 U. S.] 638; The Carroll, 8 Wall. [75 U. S.] 305; The Favorita [Case No. 4,695]. The tug, having been guilty of such gross fault, is not entitled to recover, even though the bark was not managed with all that care which the law requires. The Wm. Young [supra]; The Catherine of Dover, 2 Hagg. Adm. 145; Ward v. The Fashion [Case No. 17,154]. The tug, having been guilty of a positive violation of law all doubts are to be resolved against her, and the burden is upon her to show that the accident would have happened if she had performed her duty. The Pennsylvania [Id. 10,950]; The Comet [Id. 3,051]; The Continental [Id. 3,141]; The Favorita [supra]; Taylor v. Harwood [supra]; Saltonstall v. Stockton [Case No. 12,271]; The Ariadne, 13 Wall. [80 U. S.] 479. The cases of The A. Denike and Gray Eagle are the only ones which tend to support the theory of the tug.

EMMONS, Circuit Judge. The tug Goodnow was lying for a tow in Lake Huron, in the vicinity of the head of St. Clair river, in conformity with a well known usage. It was about 3 a. m., and although still dark, her hull could be seen in time to avoid her, had it been known she was without a lookout, and would not herself discover approaching ships,

so as to perform her duty and move out of the way. All her lights were brightly burning, with steam up, ready at any moment to move. A great number of vessels were in the vicinity. She was drifting before the wind, about two miles an hour, with her head to the eastward, so as to display to the Sunnyside, which was approaching from the southward, her white and green lights. These were seen by the latter nearly ahead, but, we infer, somewhat over the larboard bow, long before the collision, and, by the experienced lookout, announced to the master in charge. He came forward, observed them, and remarked they were on a steamer, and that she "was all right." He soon went further aft, to his more common station midships, where he could walk from side to side, in the observance of other lights, and where he could from time to time approach the compass, and issue orders at the wheel. The Sunnyside's speed was about nine miles an hour. The lookout observed the continuous bearing of the tug, which indicated she was not under way and lay nearly in his path. It was not until they approached the immediate vicinity of the tug that the lookout, having had his attention turned in other directions by different lights discovered that they were in dangerous proximity. He then hastily announced the fact to the master. The latter at once gave orders to starboard, but too late to avoid the disaster which sank the tug. Upon these facts it is claimed the bark was to blame for not starboarding earlier. With some doubt, and after much hesitation, we hold the Sunnyside to be without fault, believing that, in the circumstances, she was warranted in keeping her course. In arriving at this conclusion, we are in some degree influenced by the wholly inexcusable and exceptionally gross character of the Goodnow's fault The nature of the original libel and the untruthful and now abandoned proof to support it, we hold as legitimate subjects of consideration in denying a remedy.

In order to appreciate the character of the misrepresentation in the original libel and proofs, it must be borne in mind that it is now conceded the Sunnyside was at no time over the tug's quarter, or in any direction where by any possibility she could be supposed to be there. Without attempting literal accuracy, substantially the original libel alleged that, while the tug was lying as already indicated, the Sunnyside was made over their starboard quarter, and so far astern that there would have been a broad berth between them, as she passed, of nearly half a mile. That, instead of keeping her course under the rule, she suddenly ported and ran down the Goodnow. No confession of fault was made; but a case stated, having in no one of its features the most distant resemblance to the facts as they are now conceded at the bar, and contained in the amended libel. The owner of the tug was on board, and

the libel necessarily framed from his and his officers' statements This false case was sought to be supported by testimony so inherently absurd and so undeniably untrue, that it is unworthy of criticism. In all this there is much which, unexplained, is so highly unconscientious as to merit censure, and essentially affect the right to relief. The Mabey and Cooper, 14 Wall. [81 U. S.] 205. No question as to the circumstances in which the amendment was made has been raised here. That no person on board the tug saw the lights of the Sunnyside until just as the collision occurred, is conceded. If they did see them, their fault is only the more extraordinary. The amended libel charges four faults upon the bark: that she had not a proper lookout; that she did not see the tug; that she did not perceive that the tug was not in motion. These imputations are conclusively negatived by the testimony. The fourth is a vague generality, giving no enlightenment to respondent, and is such as we would, upon exception, hold not to be the subject of proof. The officer in charge having once observed the light, had full authority to act upon the assumption that the steamer would avoid him. We hold, if a light is announced to the officer in charge of a vessel, obliged under the rules to keep her course, and from full observation, the unambiguous apparent conditions in reference to wind, atmosphere, course, distance and character of the vessel, all indicate absolute safety if the law of the road is complied with, he may leave the future watching of such a light to an experienced lookout. It will not be a fault that he does not himself remain with the latter and participate in his observation. He may return to his post further aft, to his general duties in the ship, and especially, if other lights are off abeam and over the quarters, give his attention to them, and in all cases frequently to his compass and his own course.

The application of the principle to ships whose duty it is to a oid others, requires only a more close criticism of the circumstances, and more frequently demands longer and continuous observation by the master. If, from such observation, any circumstances known, or which with ordinary diligence might be known, indicate a departure from the rules by the approaching ship, or would suggest danger of collision, from any cause, to an intelligent seaman, the duty of careful and continuous watchfulness is imposed upon the master He would have no right in such a case to leave to the lookout the difficult duty of deciding when, on account of increasing hazard, he should again announce the light. When, in these latter circumstances, the officer has exercised his best judgment, and kept his course, or, waiting until the peril was great, has departed from the general rule, the court should not reverse his judgment, unless the error has been gross and unpardonable. It is not the duty of a lookout to reannounce a light, unless some

new conditions occur, which an intelligent officer of the deck would not anticipate, from the first observation made, and in reference to which it is in some degree probable a new order would be given.

These general principles, we think, will receive a ready common assent. We apply them here as follows: That the master performed his duty by remaining aft, where he could not see the danger, we have already sufficiently said. We think it equally clear that the lookout did his. An unnecessary argument was made to show that he might, from her continuous bearing, perceive that the tug was at rest. This seaman frankly swears he did so perceive it, and the fact is too apparent for discussion. But it indicated nothing in the least unusual, and imposed no duty upon the lookout of reannouncement. Certainly when not at a distance, because the custom is as common as the trips of the sail craft for which they lay in wait. Nor was a near approach with the same condition any more alarming. It is a common practice for these vessels to wait before they move for the close proximity of those which approach them. As a class, they are small vessels, with powerful engines, and are both started and backed with the utmost rapidity. From the nature of their avocations they acquire an extraordinary dexterity in avoiding vessels close aboard, and consequently, beyond all others, risk nearness of approach. If this one had not the characteristics of her class, it but adds another reason why assuming their attitude and proclaiming that she had, relief should be denied. Out of many thousands of instances where similar vessels have lain in the same way, not one in the whole history of navigation is known to have failed in the performance of her duty. The lookout had a right to repose, therefore, not only upon the statutes of the country, but upon the peculiar power and long practice of this class of ships to perform in just their circumstances the duty which they impose. It was in the night, when no eye can measure the distance to a light, or the hull of a ship of unknown size, so as to discover the difference between two, four and six hundred feet. The tug was already moving two miles an hour before the wind. The bark was going nine, with her bows alternately elevated and depressed, and swayed to the right and left as she rose and fell with the waves. These conditions rendered an immediate discovery of the precise moment when the tug, by a few turns of her wheel, should move slightly ahead or astern, as she should elect, utterly impossible. If life depended upon it, it could not be done. She would have to pass several times the distance necessary to avoid the bark before her movement could be perceived by the lookout.

He, too, was engaged in watching for other lights, in entire confidence that this one would move out of his way, and would not,

upon the most familiar principles, give it any particular attention. That he would from time to time see it, is certain, because it lay in plain sight before him, and he concedes he did observe its continuous bearing. But it is equally certain, if he was actuated by the motives of ordinary men, he would not, as he states, particularly notice it until some new and extraordinary predicaments suggested that it was not likely to obey the laws which so many hundreds before had obeyed in like situations. Add to these conditions the rule of law, that if the bark changed her course at all in advance of real danger, she would be condemned for the fault, and we have presented predicaments in which it seems to us little less than a cruel misapplication of rules to hold the vessel liable because the lookout did not decide the precise moment at which he crossed the line of safety. We asked in vain from the learned and experienced counsel in this case a diagram designating in time and distance the point at which the lookout should have reannounced the light. None such has been furnished. We apprehend it would be difficult to draw one which would stand the criticism of an expert.

In a case where the fault of the libellant is excessively gross, where the bark has kept her course in accordance with the law, where her officers and lookout are proved to be of the very highest character, and where, to say the least, their conduct has been all which in ninety-nine cases in the hundred can be secured, we should deem it most impolitic for the safety of navigation, a discouragement to the performance of duty by good seamen, to set up in court, for the benefit of those who have outrageously violated the law, a rule of criticism which would condemn the respondents' ship. In exceptional circumstances, and under the stimulus of apprehended danger, "sleepless vigilance," rightfully in such circumstances demanded, is possible. With our present faculties it cannot be long sustained, nor do the ordinary exigencies of commerce demand it. When the facts presented not only fail to excite suspicion of peril, but, where viewed in connection with legal rules, authorize entire confidence that all is safe, ordinary care is all which can be continuously exercised, and all which the law requires.

We would like to have grouped the decisions which sustain more pointedly the various propositions involved in the preceding disposition of this case. Again compelled to work in an unusual mode from failing sight, and with many undecided cases demanding attention, we can do no better than to refer to judgments in the order in which they have been examined. In our selections we can go but little beyond the exceptionally full and thorough briefs of counsel.

The following cases show our judgment would be sanctioned by the English admiralty courts: The Test, 5 Notes of Cas. 276. Dr.

Lushington says: "I cannot conceive that anything would be more likely to lead to mischievous consequences than to suppose that a vessel, whose duty it is to keep her course, should anticipate that another vessel will not give way, and so give way herself. The consequences would be that there would be no certainty. The certainty which results from adhesion to general rules is, in my opinion, absolutely essential to the safety of navigation." The George, Id. 371. This is emphatically repeated by the same judge. The Superior, 6 Notes of Cas. 607. He says the proof must be entirely clear, showing the necessity for the deviation, before it can be even justified. It is a different thing to hold that a neglect to do so is a fault. And see, equally pointed, a case quite beyond the requirements of the Sunnyside. The Vivid, 7 Notes of Cas. 127; The Immaganda Sara Clasina, Id. 582. A vessel, whose duty it was to keep her course, did not deviate until she had twice hailed the other, and at last, in alarm, did so, and was condemned in the entire damage. It is an extreme case, and goes far beyond what it is needful now to argue. We would hold the master blameless if the approaching ship neglects his duty so long as to produce alarm in an experienced sailor. And see a more recent enforcement of the same rule. The Gitana and The Esk, L. R. 2 Adm. & Ecc. 350. The Esk's light indicated her at anchor. Minute observations might have discovered she was in motion, but the Gitana was held faultless for full reliance on the lights.

The decisions of our own courts are equally pointed in the same direction. The Clement [supra]. A ship, conceding her own fault, asked a decree for division against another which was entitled to keep her course. It had been plausibly argued, as in this case, that as she approached close to it, it was entirely manifest a movement on her part would have prevented the disaster. Judge Curtis says: "Upon the rule of navigation applicable to such cases, he was not only in the right in acting upon the assumption that the brig would be so steered as to keep out of his way, but he was bound to act on that assumption, and keep his course, unless he saw that there would be no probable chance of a collision if he disregarded the rule." The Ariadne [supra]. A brig, having an imperfect starboard light, was sunk in the night by a steamer. It was sought to sustain the libel on the ground that by extraordinary vigilance the brig might have been sooner seen. Judge Woodruff, affirming the decree dismissing the libel, says: "But vessels have a right to assume that other vessels, if in their neighborhood, are acting in obedience to the statute regulations, and where the negligence of the sailing vessel, and her failure to comply with the statute requiring her to bear a light which can be seen at a distance of two miles, have led the steamer into danger of collision, it is not for the sailing vessel

to insist that by more than usual vigilance she might nevertheless have been discovered at a few yards' greater distance, and to claim contribution on that ground." This case is reversed in 13 Wall. [80 U. S.] 475, but upon grounds which do not in the least affect the principle for which we quote it. That court, taking an entirely different view of the facts, declared the steamer guilty of gross fault, that "for all the purpose of the case, there might as well have been no lookout on the steamer." The expressions in reference to "sleepless vigilance," are carefully confined to the crowded thoroughfare in which the collision occurred, and were applied to a ship upon whom was cast the duty of avoidance. They notice, too, that although the light of the bark was dim, she could have been seen a quarter of a mile, if the lookout had done his duty. The judgment in no way qualifies the rule of law laid down by the circuit and district judges, that the gross fault of a libellant cannot impose exceptional vigilance upon another. This is well-settled law in the supreme court. In The Comet [Case No. 3,051], Judge Woodruff says that where a party seeks a recovery after confessing a fault on his part, he must be held to the clearest proof of wrong on the part of his adversary. It is not enough to leave it in doubt. In Saltonstal v. Stockton [Id. 12,-271], Chief Justice Taney lays down the following principle at common law, which is equally applicable in a court of admiralty: "If a man unlawfully places another in a situation which compels him to undergo one of two hazards, and forces him to choose upon the instant between them, he necessarily gives him the right of selection, and must be responsible for the consequences, although it may turn out that the most fortunate alternative was not adopted." The Scotia [Id. 12,513]. The Berkshire, with illegal lights, led the Scotia to suppose that it was a steamer, at so great a distance that her colored lights were hid by the convexity of the ocean. She was, in fact, but a few rods off. In a judgment which, on account of the magnitude of the values involved, was the result of more than ordinary examination, Judge Woodruff, affirming on appeal what Judge Blatchford had ruled in the district court, said: "It was night, the distance of the Berkshire could not at that instant be known. If the Scotia attempted to go to port, it was not at all improbable that she would meet the ship while in the act of turning, while by turning to starboard there was a like uncertainty. Her officers must choose. They did exercise their judgment in good faith, and yet the collision ensued." Attention is called to the fact that lights, in reality within a few rods, were supposed four miles off upon the mast of a steamer whose colored lights were below the line of vision over the water. Here the Sunnyside is asked to decide, within two or three hundred feet, the precise distance of the Goodnow. This case has been affirmed

by the supreme court, although not yet in the reports. The William Young [Case No. 17,-760]. A sailing vessel, in fear of a collision, having changed her course to avoid it, was injured by a steamer. Judge Betts says: "Sailing vessels cannot justify a departing from their course on a probability of encountering an approaching steamer, unless she is crowding so much upon the track as to create imminent danger of collision." The R. B. Forbes [Id. 11,598]. The libellant's vessel saw a steamer more than a mile off; she might easily have avoided her by a slight movement, but as it was her duty to keep her course, Judge Sprague decreed for the whole damage, upon the ground that she had a right up to the last moment to suppose the steamer would avoid her. He adds, it would have been a fault for her to have changed her course. The Corsica, 9 Wall. [76 U. S.] 630; s. c. [Case No. 3,256]. It was the duty of the America to avoid the Corsica. In attempting to cross her bows at a late period, discovering it was too late to do so, she stopped and backed. The Corsica, in the supposition that she was going to carry out the attempt, starboarded. This would have been entirely safe, but for the unexpected backward movement of the America. Although the Corsica was misled into this movement, the district, circuit, and supreme courts all condemned her in the entire damage of thirty-three thousand dollars. She did not adhere to the rule and keep her course. Bentley v. Coyne, 4 Wall. [71 U. S.] 512. When a vessel, at the last moment, in great peril, altered her course, the court, in holding it justifiable in the circumstances prescribes rules clearly showing the Sunnyside was right in holding it, even if it would not have been a fault to do otherwise.

It is in no disregard of the familiar rule that the admiralty, if it suffers recovery at all, where there is mutual fault, equally divides the damages, that we say that when there is a gross and criminal departure from well-settled rules and an absence of all common care on the part of the libellant, he should not be entitled to recover, even although he succeeds in proving a slight fault against his adversary. The Comet [supra]. Judge Woodruff examined the question of fault on the one side, in the light of that shown upon the other. Numerous judgments pursue the same course. It may, perhaps, resolve itself into the simple truism that the more gross and improbable is the fault, upon the one side, the less is the duty of observation and of its anticipation on the other.

An extraordinary criticism is made in this case. Complaint is made that a lookout on a vessel entitled to keep her course, with a light before him which a seaman of common prudence would take for granted would get out of the way, temporarily took his eyes from it to watch other points of the horizon along which were numerous lights. Wholly unreasonable as is such an objection, when coming from the mouths of those who put them forth to protect themselves from the consequences of their own wrongs, they are nevertheless not novel, and have been frequently answered by judges of the highest character. The Europa, Brown. & L. 89; 2 Eng. Law & Eq. 557. The privy council, affirming the decision of the high court of admiralty, dispose of such a criticism in favor of this bark. The Charles Bartlett, being close-hauled, and bound to keep her course, and the steamer which sunk her having been found in fault, it was urged the sail vessel should contribute to the damage, because, among other imputed faults, it was conceded the lookout, just before the collision, had his attention attracted from the steamer by turning to observe some workmen engaged in coppering the rail. Their lordships say: "We can pay no attention to that argument; his business as lookout was to walk with his eyes to the horizon, but that does not mean that he is not to turn his eyes off to watch what a man is doing. All these expressions, 'lookout,' are to be taken in the common sense. He might do that, and look after the man coppering the rail." They say, as the bark was entitled to keep her course, the absence of a lookout was less important. Answering the objection that the bark might have heard the steamer sooner, they add: "Now we think, with reference to that, the circumstance that she was keeping her course was very important, because a ship keeping her course is only bound to go on and keep her course; not anticipating and watching that other persons are coming. If she had heard something was coming, she would have been entitled to consider that it would come so as not to do her damage." A different rule, of course, would apply when perceived irregularities indicated danger, and especially to a vessel bound to avoid another.

When that high degree of watchfulness necessary only in circumstances of danger, is in argument required of those who are entitled to their way, upon the ground that unexpected irregularities may attend the movements of an approaching ship, the appropriate answer is that given by Judge Woodruff in The Scotia [supra], where substantially he says: such a position assumes what is not to be assumed; that irregularities will occur, or that officers, without evidence that they are probable, are bound to presume they will happen. Not in reference to a vessel having a right to keep her course, but to those who are bound to keep out of the way, and where a higher duty is imposed than that demanded of the Sunnyside, the supreme court in The Grace Girdler, 7 Wall. [74 U. S.] 203, lays down the following reasonable rule: "The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances, such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view, the safety of life and prop-

erty." The remarks in Williamson v. Barrett, 13 How. [54 U. S.] 101, are peculiarly applicable in cases like this. The supreme court says it is by no means enough to show that a particular act or movement would prevent a collision, it must further appear it is a legal duty to make it. In ninety-nine cases in a hundred, vessels bound to keep their course might save collision by deviation, but it is not their legal duty or right to do so. Equally stringent in the application and unambiguous in expressing the rule in manifold applications are The Continental [Case No. 3,141], by Judge Woodruff; Wheeler v. The Eastern State [Id. 17,494], by Judge Curtis; The Favorita [Id. 4,695]: Taylor v. Harwood [Id. 13,794]; The City of Paris, 9 Wall. [76 U. S.] 635. In Baker v. The City of New York [Case No. 765]. Judge Clifford says: "The vessel whose duty it is to keep her course should do so as if there were no danger." And in Wakefield v. The Governor [Id. 17,049] he adds that these suggestions, that a ship bound to keep her way might by deviation avoid the collision, are entitled to but little weight. See, also, The Catherine of Dover, 2 Hagg. Adm. 145; Ward v. The Fashion [Case No. 17,154]; The Lion [Id. 8,379]; 1 Pars. Shipp. & Adm. 529, and cases cited; The Carroll, 8 Wall. [75 U. S.] 305; The Johnson, 9 Wall. [76 U. S.] 146; Crockett v. Newton, 18 How. [59 U. S.] 583; The Steamship Co. v. Rumball, 21 How. [62 U. S.] 385. See, also, The Free State [Case No. 5,090], decided by this court, in which the general principle authorizing full confidence that the rules of navigation will be adhered to is announced, and the leading judgments considered.

A full consideration of the books cited by the libellants is impossible. None of them, save one, purporting to be a correct manuscript report of a decision by Judge Clifford, have any tendency at variance with our judgment. We doubt whether it is fully before us. The Gray Eagle, 9 Wall. [76 U. S.] 505, is cited by the libellants. The case bears no analogy to this. The court say the Gray Eagle was grossly in fault for not perceiving that a light which must have crossed from the larboard to the starboard bow, was in motion and not at anchor. The remark that the master should have watched the light, we should agree with in the circumstances of that case. The Havre [Case No. 6,232], a vessel whose duty it was to keep out of the way, was guilty of manifest irregularities in such ample time before the collision, that had they been known to the officer on the other ship, ordinary prudence would have demanded a deviation. The lookout signally failed to do his duty. The case is but a common illustration of principles we fully concede. With some of the arguments in the opinion, if, as we much doubt, it is intended to sustain the inferences which counsel sought to draw from it, we should not agree. The Cornelius C. Vanderbilt [Id. 3,235]; The

Hope, 1 W. Rob. Adm. 157, are like cases. 1 Pars. Shipp. & Adm. 580, and notes, refers to the leading cases, holding that a rule of navigation should not be stubbornly adhered to. He remarks that The Oregon, 18 How. [59 U. S.] 570; Crockett v. Newton, Id. 581, take a somewhat different view. If it is supposed that tribunal has decided a rule of navigation may be stubbornly adhered to, we do not so understand them, and certainly proceed in no such notion now. If there be any difference between the English and American rulings upon this subject, the former are more rigid in insisting upon adhesion to rules of navigation.

We think the judgment referred to and the rules best for the safety of navigation, establish the right of the Sunnyside in the circumstances which were presented to her lookout to keep her course up to the point when collision became inevitable. She then did all in her power to avoid it. We find that there was no fault in the master for returning to his post, or in the lookout, standing on the forecastle of his heaving ship, in the night, with no guide object between him and the light, that he did not discover the difference between a movement of two miles an hour and five, or in distance between six hundred feet and two. Carelessness on the part of the libellants, which, if life had been lost was undeniably criminal, can cast no such extraordinary duty upon the approaching ship. Decree for the cross-libellant.

[An appeal was taken to the supreme court, where the above decree was reversed, and the cause remanded, with directions to enter a decree affirming the district court. 91 U. S. 208.]